## DOC BARKER v. STATE.

No. A-4413. Opinion Filed July 14, 1924.
(227 Pac. 846.)

(Syllabus.)

**Homicide—Evidence Sustaining Conviction for Murder.** The evidence, in part circumstantial, amply justified the jury in finding the accused guilty of murder.

Appeal from District Court, Tulsa County; W. B. Williams, Judge.

Doc Barker was convicted of murder, and he appeals. Affirmed.

John Sykes and W. L. Coffey, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. On the 26th of August, 1921, the Fuller Construction Company was engaged in the construction of the

St. Johns Hospital located in the southern suburbs of the city of Tulsa. The building was of immense proportions, and there was much valuable material on and about the premises. To protect their property the construction company employed a night watchman, Thomas Terrill, a man about 65 or 70 years of age. Upon these premises there was a small frame building, used by the company in the daytime as an office, and containing office furniture and a small iron safe. At night the office was used by the watchman as a resting place, and from there he started hourly to inspect different parts of the premises, where at various places he was required to punch the dial of a time clock which registered the time of his various inspections.

On the night of the homicide this mechanical device showed that the watchman had made his regular 11 o'clock inspection, but that none of the dials had been punched after that hour. The following morning the old watchman was found dead, with his feet resting upon the steps leading to the entrance of the office, his body prone upon the earth, with two bullet wounds in it. Both of the bullets which had entered the body were found at a post mortem examination and preserved. One of these was of a peculiar shape and unusual composition. Upon investigation it was found that only one hardware store in Tulsa sold that kind of ammunition. From the clerks in that store the county evidence man ascertained that a man by the name of Bingley, who operated a line of taxi vehicles, had purchased such ammunition. Bingley had in his employ as a taxi driver one Sylvester Gillard, who, in the absence of Bingley's wife, who was away on a visit, was frequently in Bingley's room. In this room, in a leather hand bag, were two pistols, presumably the property of Bingley. On the night of the homicide one of the participants in the crime went to Gillard, told him that he wanted

two guns to use that night, and asked Gillard if he knew where he could get them. Gillard knew that Bingley was away from his rooms, at some kind of a lodge meeting, and in Bingley's absence went to the room and procured these two guns and delivered them to the person who had asked him for them, this person in turn delivering them one to a man named Davis and the other to the defendant, Barker. The defendant and three others, with these pistols, lay in wait at Admiral Park, near the place where the hospital was being built, and there completed their plans which had been previously partly made for robbing the old night watchman and the safe in his charge. On several occasions Gillard had heard the participants discuss plans to rob this night watchman, and after the tragedy he heard them discuss the manner of the killing. After the homicide the guns were returned to Gillard and replaced in the room belonging to Bingley. Gillard had considerable difficulty in procuring the pistols from the men who had used them in order to return them to the owner without whose knowledge or consent they had been taken. A few days later these guns were stolen from Bingley's room, and their whereabouts at the time of the trial was unknown.

The story in full is replete with interesting details. Some of the participants in the crime, mere boys, seemed to be imbued with a spirit of total depravity, and to be without any regard whatever for human life—one of them arguing that it would not be murder to kill so old a man because his span of life was nearly spent.

The defendant, on the witness stand in his own behalf, admitted that he was with the participants, and discussed with them the advisability of the robbery, just prior to the commission of the crime, but maintained that he refused to participate in the hold-up, not out of any moral consideration,

but because the loot likely to be taken would be small, and would have to be divided among too many people.

For some time after the tragedy the murder of this old night watchman remained a mystery. It was due to the commendable zeal and skill of the county attorney and the county evidence man that the facts just recited, and many more that might be recited, were disclosed. Some of the evidence implicating the defendant was circumstantial and some of it was direct. Whether the man Gillard, who furnished the pistols with which the homicide was committed, was an accomplice, does not clearly appear from the evidence. However that may be, the jury were correctly instructed upon the law of aiding and abetting, and the term "accomplice" and its application in this case were correctly defined. Whether Gillard was an accomplice or not, there was the testimony of other witnesses and a multitude of circumstances pointing to the guilt of the defendant. It appears conclusively that the defendant was one of the persons who planned the robbery, and the jury evidently believed that he was in the act of carrying out that crime when the murder was committed.

The court's instructions to the jury were fair, clearly and correctly defining the law of the case, and the defendant in all other respects was accorded a fair trial. The claim of the defendant that his application for a continuance should have been granted, and that the court committed error in permitting a list of additional witnesses to be indorsed on the information, have been carefully examined, and found without merit. Neither of these claims presents any new question or application of law warranting an extended discussion of the question.

The judgment of the trial court is affirmed.

MATSON, P. J., and DOYLE, J., concur.